IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | |
|---|---|
| Billie Jean Johnson Todd, ) <br> on behalf of Joseph D. Johnson, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> Michael J. Astrue, ) <br> Commissioner of Social Security, ) <br> ) <br> Defendant. ) <br> _____ ) | Civil Action No. 8:07-3557-JFA-BHH <br><br><br><br> **REPORT AND RECOMMENDATION** <br> **OF MAGISTRATE JUDGE** |

This case is before the Court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

Billie Jean Johnson Todd, brought this action on behalf of her son, Joseph D. Johnson, pursuant to Section 205(g) of the Social Security Act, as amended, (42 U.S.C. Section 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security Administration regarding her son's claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. Although Mrs. Todd is the claimant, in fact, in this case and Joseph Johnson is no longer living, the Court will continue to refer to him as "the plaintiff" for efficiencies sake.

## RELEVANT FACTS AND ADMINISTRATIVE PROCEEDINGS

The plaintiff was 37 years old at the time he applied for DIB and SSI and 40 years old on the date of his death. (R. at 37-38, 96, 764, 768-69, 781.) He had a high school education (R. at 123, 782), and has past relevant work experience as a restaurant manager, produce associate and frozen food stocker. (R. at 118, 134, 154-55, 804-05.)

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

He alleged he was disabled since November 15, 2000 (R. at 86, 764), due to fibromyalgia, chronic fatigue, hepatitis B, migraine headaches, depression and anxiety.  (R. at 117.)

The plaintiff protectively filed applications for disability insurance benefits (DIB) and supplemental security income benefits (SSI) on January 4, 2002.  (R. at 96, 764.)  After his applications were denied in initial and reconsidered determinations (R. at 37-38, 55-60, 62-64, 768-72), he requested a hearing before an Administrative Law Judge (ALJ) (R. at 65).  The plaintiff died on July 22, 2004, as a result of a narcotics overdose (R. at 77-78, 106-09, 111, 700-03, 782), and his mother, Billie Jean Johnson Todd, was substituted as the claimant.  (R. at 77-78.)

A hearing was held on August 23, 2004, at which Mrs. Todd, her attorney and a vocational expert were present.  (R. at 777-810.)  On November 12, 2004, an ALJ issued an unfavorable decision finding that Mr. Johnson was not disabled.  (R. at 39-50).  Mrs. Todd requested a review of the decision (R. at 79, 81-85), which the Appeals Council granted on December 21, 2005.  (R. at 90-95.)  Due to the plaintiff's death, the Council dismissed his request to review the SSI portion of his claim (R. at 86-89), but remanded the DIB portion of his claim for further evaluation.

A second hearing was held on July 19, 2006, at which Mrs. Todd and her attorney were present.  (R. at 811-44.)  On September 8, 2006, the ALJ issued another unfavorable decision in which he found Mr. Johnson was not disabled.  (R. at 17-27.)  The Appeals Council denied the plaintiff's request for a review on August 31, 2007 (R. at 9-12), thereby making the decision of the ALJ the final decision of the Commissioner for purposes of judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)   The claimant meets the insured status requirements of the Social Security Act through September 30, 2003, but not thereafter
>
> (2)   The claimant has not engaged in substantial gainful activity since November 15, 2000, the alleged onset date (20

CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

(3)     The claimant has the following severe impairments: post traumatic stress disorder (PTSD), major depressive disorder, anxiety, personality disorder, hepatitis B, chronic fatigue syndrome, fibromyalgia and substance abuse (20 CFR 404.1520(c), 416.920(c)).

(4)     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.920(d), 416.925 and 416.926).

(5)     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to lift and carry 20 pounds occasionally, 10 pounds frequently with restrictions which required routine, repetitive tasks involving simple 1-2 step instructions, as in unskilled work and no public contact.

(6)     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

(7)     The claimant was born on June 16, 1964, and was 35 years old on the alleged disability onset date, which is defined as a younger individual age 18-44.  The claimant died on July 22, 2004, and was age 40, which is defined as a younger individual. (20 CFR 404.1563 and 416.963).

(8)     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

(9)     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled", whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

(10)    Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), 416.966).

> (11)  The claimant has not been under a "disability," as defined in the Social Security Act, from November 15, 2000, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## APPLICABLE LAW

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. §423(a).  "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. §423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, the Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment.  *See* 20 C.F.R. §404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary.  *See Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  Social Security Ruling ("SSR") 82–62.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. §423(d)(5).  He

4

must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir.1966). Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **DISCUSSION**

The plaintiff contends that the ALJ erred in failing to find him disabled. Specifically, she alleges that the ALJ erred in (1) failing to give "controlling weight" to the plaintiff's treating physicians; (2) failing to properly evaluate the plaintiff's credibility; (3) giving controlling weight to a non-treating psychologist's opinions; (4) failing to consider the mental requirements of the plaintiff's ability to perform any kind of work on a sustained basis; and (5) concluding that the plaintiff was a drug abuser. The Court will consider each alleged error in turn.

**I.    TREATING PHYSICIANS**

The plaintiff first contends that the ALJ failed to give the opinion of his treating physician, Dr. Willie Moseley, controlling authority. Dr. Moseley was the plaintiff's treating physician for approximately 18 years. (R. at 387-522.) Dr. Moseley diagnosed PTSD, dysthymia, chronic pain disorder, narcissistic personality disorder, chronic fatigue syndrome, fibromyalgia, chronic migraine headaches, and hepatitis B. (R. at 523.)

On June 3, 2002, Dr. Moseley completed a psychiatric impairment questionnaire. (R. at 523-30.) He stated that the plaintiff demonstrated poor memory, appetite disturbance, sleep disturbance, personality change, mood disturbance, emotional liability, loss of intellectual ability, substance dependence ("on antidepressants"), panic attacks, anhedonia, psychomotor agitation or retardation, feelings of guilt/worthlessness, difficulty thinking, suicidal ideation, oddities of thought, perceptual disturbances, disorientation, catatonia, social withdrawal, blunt/flat affect, decreased energy, obsessions or compulsions, intrusive recollections of trauma, irrational fears, anxiety, irritability and pathological dependence. (R. at 524.) He stated that the plaintiff had moderate limitations on his abilities to remember locations and work-like procedures, understand, remember and carry out one or two step instructions, make simple decisions, and ask simple questions. (R. at 526-27.) He stated that the plaintiff was markedly limited in his abilities to understand, remember and carry out detailed instructions, maintain attention, perform activities within

a schedule, sustain an ordinary routine, work in coordination/proximity to others, complete a normal workweek, interact with the general public, accept instructions, get along with coworkers, maintain socially appropriate behavior, respond to changes, be aware of hazards, travel to unfamiliar places, or set realistic goals. (R. at 526-28.) He stated that the plaintiff was "incapable of even 'low stress'" work and would miss about four days of work per week. (R. at 530.)

Dr. Moseley also completed a multiple impairments questionnaire which concluded that the plaintiff's prognosis was poor and that he had no reliable work history. (R. at 531.) He stated that the plaintiff's fatigue ranged from seven to ten on a ten-point scale. (R. at 533.) Dr. Moseley found that, in an eight-hour day, he could sit and stand/walk for no more than one hour each. (R. at 533.) He further stated that he could occasionally lift and carry no more than ten pounds. (R. at 534.) Dr. Moseley assigned "marked" limitations in the upper extremities. He concluded that the plaintiff's symptoms would increase in a competitive work environment and that he could not keep his neck in a constant position. (R. at 533.) Dr. Moseley found that the plaintiff's symptoms "constantly" interfered with attention and concentration, he required frequent breaks, and he had several environmental and postural limitations. (R. at 536.)

On June 14, 2002, Dr. Moseley completed a report wherein he noted that <u>the plaintiff was raped by his older brothers several times per week for four or five years, and later by an adult male relative</u>. (R. at 493.) He noted that the plaintiff saw himself as bisexual. *Id*. Dr. Moseley diagnosed the plaintiff with PTSD, narcissistic/borderline personality disorder, major depression, anxiety with panic, social anxiety, and physical symptoms, chronic fatigue syndrome, fibromyalgia, migraine headaches, hepatitis B and allergies. (R. at 494.) Dr. Moseley observed that the plaintiff had experienced "no 'growth'" toward adulthood in 15 years. *Id*. He noted that Mr. Johnson "[could not] handle death." He noted that he never revealed details of his sex abuse to him in 15 years and "could spend years in therapy" (R. 493-94).

7

The medical opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. *See* 20 C.F.R. §416.927(d)(2)(2004); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig v. Chater*, 76 F.3d 858, 590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d at 178 (*citing Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)).

A "medical opinion," is a "judgment[ ] about the nature and severity of [the claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite impairment(s), and [his] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-2p. Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *See Blalock*, 483 F.2d at 775.

To the Court, the ALJ's consideration of Dr. Moseley's medical opinions does not in any way satisfy the regulatory requirements. In fact, it can hardly be said that Dr. Moseley's opinions were considered at all. Specifically, the ALJ summarily concluded that Dr. Moseley's opinion could not be given significant weight, "as his reports were more of the claimant's opinion, not Dr. Moseley's." (R. at 23.) The ALJ's only justification for so concluding was the notation of Dr. Moseley concerning the plaintiff's desire to be "present when he completed the questionnaire because the claimant wanted to be sure that Dr. Moseley wrote precisely what his problems were as was seen by the claimant and Dr.

Moseley indicated all symptoms were marked to moderately limited." (R. at 23, 530.) The ALJ never discusses whether Dr. Moseley's opinions were inconsistent with his own medical records or the opinions of other treating physicians. As far as the Court can tell, the ALJ never really explained his view of any of Dr. Moseley's judgments, other than to blanketly surmise that they had been adopted exclusively on the strength of the plaintiff's representations. The ALJ made no finding that Dr. Moseley's opinions were in conflict with any other substantial evidence of record.

Notwithstanding Dr. Moseley's notation concerning the plaintiff's desire to be present, the ALJ's decision, and the defendant's position in support of that decision, necessarily rest on the unjustified assumption that Dr. Moseley would have rotely adopted the representations of the plaintiff concerning his limitations in spite of some medical judgment, held by Dr. Moseley, to the contrary. There is no evidence to so conclude. First, physicians should, and do, appropriately rely on representations made by patients in forming a medical or functional opinion. *See, e.,g., Flowers v. Wal-Mart Stores, Inc.*, 2005 WL 2787101, at *6 (M.D. Ga. October 27, 2005) ("Subjective reports of pain and other symptoms by a patient are an important part of a physician's examination, and doctors routinely rely on such statements.") Second, there is nothing facially improper about the plaintiff's request to be present to ensure that the limitations were reflected as he observed them. Such a request might be interpreted as an attempt to manipulate the medical opinion so as to include false information or limitations. Or, it could be interpreted simply as a desire to ensure that the opinion was complete and accurate. The ALJ cited no reason to take the former interpretation over the latter. Third, even if the plaintiff intended to influence the results of the opinion rendered, it is, to the Court, inappropriate to assume that Dr. Moseley permitted himself to be so influenced. The defendant has not given the Court any reason whatsoever to think differently.

A comparison of Dr. Moseley's prior statements to his ultimate medical opinions might have revealed that the opinions were not consistent with the longstanding course of

treatment and diagnosis and, therefore, appeared more like an attempt to accommodate the plaintiff's own subjective beliefs about his limitations. But, the ALJ made no such inquiry. As stated, he barely treated Dr. Moseley's opinions.

In contrast, the plaintiff has emphasized substantial evidence of record that Dr. Moseley's ultimate opinions were consistent with his treatment history. (R. at 493-522.) The plaintiff would contend that the record contains substantial clinical findings concerning the plaintiff's psychiatric condition including claimant's poor memory, appetite disturbance with weight change, sleep disturbance, personality change, mood disturbance, emotional lability, loss of intellectual ability of 15 points or more, dependence on antidepressants, recurrent panic attacks, anhedonia, pervasive loss of interests, psychomotor agitation, feelings of guilt and worthlessness, difficulty thinking and concentrating, suicidal ideation, oddities of thought and perception, social withdrawal and isolation, blunt, flat or inappropriate affect, decreased energy, obsessions, intrusive recollections of traumatic experiences, persistent irrational fears, generalized persistent anxiety, irritability, and pathological dependence or passivity. *Id*. The defendant has not responded to this showing in any respect.

The defendant on appeal has been as comparably dismissive regarding Dr. Moseley's opinion as the ALJ. The defendant does nothing more than recite the basis for the ALJ's reasoning, in a few short sentences. To the Court, the opinions of this longstanding treating physician demand substantially more consideration before they can be rejected.

Not only has Dr. Moseley's opinions not shown to be in contradiction with his own treatment notes, either by the ALJ or now on appeal, it has been essentially corroborated by all of the plaintiff's other *treating* physicians. Dr. Joseph Talley concluded, on December 20, 2001, that the plaintiff "was totally disabled from any form of gainful employment due to his severe intractable pain, fatigue, poor concentration, depression, and migraine headaches. Even with optimal treatment, his work performance would be below what I

believe would be required of him and his absenteeism itself would be prohibitive." (R. at 318.) Dr. James E. Ford, III, diagnosed the plaintiff with "[m]ajor depressive disorder with ongoing and increasing symptoms; and Fibromyalgia." (R. at 694.)

Dr. Frank Bruyere found that the plaintiff "could only sit for three hours in an eight hour day, could not sit continuously, and he could not stand or walk two hours in an eight hour workday, he was precluded from using his upper extremities." (R. at 707.) Dr. Bruyere found further that claimant had "marked limitations" in grasping, turning and twisting objects, "marked limitations" in using his fingers and hands for fine manipulations, and "marked limitations" in using his arms for reaching. (R. at 708-09.) Dr. Bruyere was of the opinion that plaintiff's constant pain was severe enough to interfere with his attention and concentration. (R. at 708-10.) Dr. Bruyere assessed that claimant was incapable of dealing with even "low stress" environments. *Id*. He said that the plaintiff should avoid stooping, bending, pushing, pulling and kneeling. Dr. Bruyere stated: "the patient is considered totally disabled without consideration of any past or present drug and/or alcohol abuse." (R. at 704.)

The ALJ declined to give any significant wait to these opinions as well. The ALJ's explanation as to these opinions is comparably thin to that given Dr. Moseley's. Concerning Dr. Ford's opinions, the ALJ simply states, "Dr. Ford treated the claimant for major depressive disorder, but no impaired judgment with appropriate affect, but withdrawn." (R. at 23.) No other explanation is given. Concerning Dr. Bruyere's opinion, the ALJ concluded that it was made over a year after the last date insured and was not supported by the evidence. *Id*. The ALJ emphasized that the only visit before the last date insured, showed no abnormal physical findings or trigger points. *Id*. The ALJ never explains why he believed Dr. Bruyere's opinion was not supported by the evidence. As to

To Dr. Talley's opinion, the ALJ gave slightly more attention. He found that Dr. Talley's ultimate opinion was inconsistent with his own treatment notes. *Id*. Specifically,

11

he found that there had been no real diagnosis of fibromyalgia and that all tests for that condition were undisputedly negative. *Id*.

The Court would likely have difficulty finding error in the ALJ's consideration of any one of these opinions – Dr. Talley's in particular. The ALJ attempted to minimally articulate how he perceived the various opinions to be in contradiction with other substantial evidence of record. When taken together, however, the ALJ's consideration of all four treating physicians poses a more serious problem. First, as discussed, the ALJ's consideration of Dr. Moseley's opinion was objectively deficient. Second, while arguably adequate, the ALJ's consideration of the other opinions is unsatisfactorily brief, and problematically so, when it is considered that all four opinions were essentially harmonious as to their recommendation. The net result is that the ALJ summarily dismissed the adamant opinion of four treating physicians that the plaintiff suffered debilitating mental and physical impairments in not more than about 7 or 8 sentences, few of which contained any serious explanation for the conclusions drawn.

The Court is particularly disturbed by the very serious allegations of sexual abuse noted in Dr. Moseley's records. These uncontradicted allegations, whenever they might have been disclosed, provide substantial and corroborating context for the types of functional problems and limitations ascribed by the treating physicians. For the ALJ to reject these opinions as noncontrolling, without serious discussion, and with essentially no consideration of the highly sensitive abuse allegations, is not the kind of evaluation, in the Court's view, that can sustain the disability determination made. The ALJ's only reference to the plaintiff's serious sexual abuse history seems less than commensurate with the gravity of its relevance: "some sexual abuse/sexual identity issues . . . ." (R. at 24.)

Accordingly, the Court finds that the ALJ lacked substantial evidence to reject Dr. Moseley's opinions as noncontrolling. Moreover, the Court finds that the ALJ has not cited sufficient evidence to reject what amounts to a unanimous decision among the plaintiff's treating physicians that he is markedly limited in his functioning, whether or not the ALJ's

consideration of any given physician might have been legally adequate. As the plaintiff further argues, therefore, it was error for the ALJ to rely, to the exclusion of these opinions cited above, on the opinion of a consulting, non-treating physician whose entire experience with the plaintiff was no more than 25 minutes in duration.

## II.     The Plaintiff's Credibility

The plaintiff next complains that the ALJ improperly attempted to assess his credibility, notwithstanding the fact that the plaintiff died prior to the first hearing and, therefore, the ALJ was never able to actually observe him. The ALJ concluded that the plaintiff's subjective complaints were not fully credible insofar as there was substantial evidence of drug seeking behavior and drug use. (R. at 24.) In fact, the plaintiff died of a drug overdose.

The problem with the ALJ's credibility determination, however, is much broader than his simple inability to observe the plaintiff. Federal regulations, 20 C.F.R. §§ 416.929(a) and 404.1529(a), provide the authoritative standard for the evaluation of subjective complaints of pain and symptomology. *See Craig v. Chater*, 76 F.3d 585, 593 (4th Cir. 1996). Under these regulations, "the determination of whether a person is disabled by pain or other symptoms is a two-step process." *Id.* at 594. First, "there must be objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* at 591 (quotation and emphasis omitted). This threshold test "does not . . . entail a determination of the 'intensity, persistence, or functionally limiting effect' of the claimant's asserted pain." *Id.* at 594. Second, and only after the threshold inquiry has been satisfied, "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated." *Id.* at 595. When the ALJ fails to "expressly consider the threshold question" and instead proceeds "directly to considering the credibility of [the] subjective allegations of pain," remand is warranted. *Id.* at 596.

The ALJ did not apply the prescribed framework and has critically ignored the first step. Rather than considering whether there was evidence of a medical impairment which could reasonably be expected to produce the pain alleged, the ALJ proceeded directly to the credibility analysis and concluded that the plaintiff's testimony should be diminished for evidence of drug abuse. (R. at 24.)  It is critical to proceed through the steps in order, because "once objective medical evidence establishes a condition which could reasonably be expected to cause pain of the severity a claimant alleges, those allegations may not be discredited simply because they are not confirmed by objective evidence of the severity of the pain . . . ."  *Id.* at 593.   Said differently, once an ALJ concludes that an impairment could reasonably be expected to produce the pain alleged, he ought to view any inconsistency or defect in the plaintiff's subjective testimony through a more discriminating lens because the plaintiff's subjective allegations, at that point, are consistent with the objective expectations.

Of course, this issue is related to the ALJ's consideration of the opinions of the plaintiff's treating physician.  Insofar as the ALJ improperly dismissed those opinions, he was more poorly positioned to make the essential inquiry at step one of the credibility analysis  regarding the objective nature of the conditions alleged and the symptoms and pain likely caused.

Certainly, it would be appropriate, even in the absence of the plaintiff's live testimony, to diminish the degree of symptomology one might objectively expect to find from a condition, in light of evidence that any specific plaintiff might be malingering or drug seeking.  But that is a step two inquiry, and one which cannot be appropriately made without establishing the benchmark for what sort of symptoms one might reasonably anticipate from the impairments alleged.  This is so precisely because the analysis at step one might ultimately influence an ALJ to conclude that the subjective complaints are still *legitimate* notwithstanding compelling evidence of, for example, drug seeking. To wit, in this

case, it may very well be true that the plaintiff had drug related problems[2] but that does not eliminate the possibility that his impairments have not still caused the problems alleged. The two are not mutually exclusive. In fact, there is nothing incongruous about the fact that a person who has been the victim of the type of abuse alleged might seek refuge in drugs or alcohol. Ultimately, an objective look at the plaintiff's conditions and their anticipated symptoms, in the first instance, assists in making a determination as to the effect of mitigating circumstances peculiar to the any given plaintiff.

### III.     Mental Impairments

Lastly the plaintiff argues that the ALJ did not consider the mental requirements of the plaintiff's ability to perform any kind of work on a sustained basis. While the plaintiff might disagree with the deterimination made, the Court cannot agree that the ALJ failed to examine the evidence. The ALJ expressly considered the effects of the plaintiff's mental impairments on his functioning. (R. at 24.) Moreover, he specifically concluded the plaintiff's "mental impairments produced some social withdrawal, so he was limited to unskilled, non-public jobs." (R. at 26.) Simply because the plaintiff can produce conflicting evidence which might have resulted in a contrary interpretation is of no moment. *See Blalock*, 483 F.2d at 775. As recited, the ALJ considered the impairments and explained his conclusions. It cannot be said that he simply failed to consider them.

### IV.     Award of Benefits

The Court faces the question whether to remand or reverse the decision of the Commissioner. Certainly, an award of benefits is more appropriate when further proceedings would not serve any useful purpose. *See Coffman v. Bowen*, 829 F.2d 514,

---

[2] The plaintiff has also complained that the ALJ was legally wrong to conclude that the plaintiff was a drug abuser. To the Court the plaintiff's reliance on 29 C.F.R. § 404.1535(b)(2)(ii) is inapposite. The ALJ was not considering drug abuse as an element of disability. As discussed, the ALJ found that the alleged drug abuse injured the plaintiff's credibility. There were facts cited from which the ALJ was permitted to draw such a conclusion. The plaintiff is correct that there is other evidence weighing against that conclusion. But, that is an issue of fact not law. The ALJ was entitled to make that determination and he cited substantial evidence in support. It is insignificant that the plaintiff can cite evidence for a contrary result. *See Blalock*, 483 F.2d at 775.

519 (4th Cir. 1987); *Kornock v. Harris*, 648 F.2d 525, 527 (9th Cir. 1985).  Alternatively, an award of benefits is appropriate when substantial evidence on the record as a whole indicates that the claimant is disabled, and the weight of the evidence indicates that a remand would only delay the receipt of benefits while serving no useful purpose, or a substantial amount of time has already been consumed. *See Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984); *Tennant v. Schweiker*, 682 F.2d 707, 710 (8th Cir. 1982).

The plaintiff's action for DIB benefits has been pending since January 4, 2002.  His applications have already been heard by an ALJ and twice denied.  The Appeals Council, in the interim, reversed the first unfavorable decision for further consideration.   Seven years later, the plaintiff and his mother still have no resolution of the claim for benefits. This represents a significant period of time.  "People generally do not seek Social Security disability benefits . . . because they want to subsidize an already comfortable existence. In many cases, they seek benefits because they have nowhere else to turn." *Schoofield v. Barnhart*, 220 F. Supp. 2d 512, 524 (D. Md. 2002).

Where no useful purpose would be served by a remand and, in fact, justice would not be served by such an outcome, outright reversal is justified.  *See Coffman*, 829 F.2d at 519.  The facts of this case justify such a reversal and award. The opinion of the treating physicians constitute substantial evidence to conclude that the plaintiff is disabled.  As stated, Dr. Moseley concluded that the plaintiff had moderate limitations on his abilities to remember locations and work-like procedures, understand, remember and carry out one or two step instructions, make simple decisions, and ask simple questions.  (R. at 526-27.) He stated that the plaintiff was markedly limited in his abilities to understand, remember and carry out detailed instructions, maintain attention, perform activities within a schedule, sustain an ordinary routine, work in coordination/proximity to others, complete a normal workweek, interact with the general public, accept instructions, get along with coworkers, maintain socially appropriate behavior, respond to changes, be aware of hazards, travel to unfamiliar places, or set realistic goals.  (R. at 526-28.)  He further stated that the plaintiff

was "incapable of even 'low stress'" work and would miss about four days of work per week. (R. at 530.)

Two administrative decisions have failed to demonstrate substantial evidence to reject these and other treating physician opinions. In fact, the Appeals Council reversed the initial decision, in part, on precisely these grounds. (R. at 92.) The continued presence of legal errors in the consideration of this matter after nearly 7 years of administrative and legal processes makes it clear that remand would serve no useful purpose. The plaintiff, therefore, is entitled to the benefits she seeks.

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, this Court concludes that the ALJ's findings are not supported by substantial evidence and that substantial evidence demonstrates that the plaintiff is disabled. Accordingly, this Court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §§405(g) and 1383(c)(3) and that the case be remanded to take appropriate action regarding an award of DIB benefits to the plaintiff based on the disability alleged to have commenced on November 15, 2000 and continuing through July 22, 2004.

IT IS SO RECOMMENDED.

                                      s/BRUCE H. HENDRICKS
                                      UNITED STATES MAGISTRATE JUDGE

February 11, 2009
Greenville, South Carolina